Ruskin Moscou Faltischek PC
1425 RXR Plaza
East Tower 15th Floor
Uniondale, New York 11556
By: Matt Bryant (MB 2005)
mbryant@rmfpc.com
*Attorneys for Plaintiff*
*Shalom Buchbinder, M.D.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| SHALOM BUCHBINDER, M.D., individually and as sole shareholder of BROOKLYN HOSPITAL RADIOLOGY SERVICES, P.C., BROOKLYN HOSPITAL MEDICAL GROUP, P.C. d/b/a BROOKLYN HEALTH ALLIANCE, BROOKLYN HOSPITAL NUCLEAR MEDICINE, P.C., BROOKLYN HOSPITAL ECG SERVICES, P.C.,  and TBHC ANESTHESIOLOGY SERVICES, P.C., | *Case No.:* |
| *Plaintiffs,* | |
| -*against*- | ***COMPLAINT FOR*** <br> ***TRIAL BY JURY*** |
| GARY TERRINONI, THE BROOKLYN HOSPITAL CENTER, CARLOS P. NAUDON, individually and as The Chair of and for The Board of Trustees of THE BROOKLYN HOSPITAL CENTER, ANNE ELIZABETH FONTAINE, individually and as The Chair or Vice-Chair of and for The Board of Trustees of THE BROOKLYN HOSPITAL CENTER, MARIA FIORINI RAMIREZ, individually and as a Trustee and the Chairwoman of The Audit and Corporate Compliance Sub-Committee of The Board of Trustees of THE BROOKLYN HOSPITAL CENTER, CALVIN J. SIMONS, MD, individually and as Vice Chair for The Board of Trustees of THE BROOKLYN HOSPITAL CENTER, ALIREZA ESMAELIZADEH, individually and as a Trustee of THE BROOKLYN HOSPITAL CENTER, GALE STEVENS-HAYNES individually and as a Trustee of THE BROOKLYN HOSPITAL CENTER, JOEL LEITNER individually and as a Trustee of THE BROOKLYN HOSPITAL CENTER, and JOHN DOES No. 1 – 5, individually and as Trustees of THE BROOKLYN HOSPITAL CENTER, | |
| *Defendants.* | |

Plaintiff Shalom Buchbinder, M.D. complains of Defendants Gary Terrinoni, The Brooklyn Hospital Center, Carlos P. Naudon, Anne Elizabeth Fontaine, Maria Fiorini Ramirez, Calvin J. Simons, Alireza Esmaelizadeh, Gale Steven-Hayes, Joel Leitner, and John Does No. 1 - 5:

## PREFACE

1.      Dr. Buchbinder is a physician duly licensed to practice medicine in the State of New York, board certified in Diagnostic Radiology. In March 2017, Dr. Buchbinder was appointed to serve as the Chief Medical Officer ("CMO") for The Brooklyn Hospital Center ("TBHC").

2.      During his tenure as CMO, Dr. Buchbinder observed first hand, and received complaints of, an actual or perceived hostile work environment created or fostered by TBHC's CEO Gary Terrinoni.

3.      These complaints, which came to Dr. Buchbinder from clinical department chairs, physicians, as well as staff members, focused upon Terrinoni's bullying and intimidation of female staff members as well as Terrinoni's mismanagement and waste of TBHC assets.

4.      Dr. Buchbinder opposed Terrinoni's actions including the actual or perceived hostile work environment created and fostered by Terrinoni, as well as Terrinoni's waste and mismanagement of the Hospital's assets, all of which created enterprise-wide risks and posed a risk to the safety of patients.

5.      Dr. Buchbinder reported those concerns to TBHC's Director of Internal Audit and Compliance at the 2019 Annual Risk Assessment and Audit Planning Meeting held on October 24, 2018.  She, in turn, reported Dr. Buchbinder's concerns, as well as her own, to Defendants Fontaine and Ramirez, in their capacities as Trustees of the Board and and TBHC's Audit and Corporate Compliance Committee on Friday, October 26, 2018.

6.      On Monday, October 29. 2018, Terrinoni reprimanded Dr. Buchbinder for doing so. Specifically, Terrinoni said that he would either terminate Dr. Buchbinder from the entire organization or demote him back to Radiology because he had heard that Dr. Buchbinder "was

speaking badly about" him and also warned Dr. Buchbinder to "be very careful what you say to any Board member" in the future.

7.     While Terrinoni's conduct was under investigation by outside counsel to TBHC, Terrinoni delayed the threatened retaliatory action.  However, Terrinoni retaliated with full force and effect when, for pre-textual reasons, Dr. Buchbinder was terminated on March 18, 2019.

8.     In this lawsuit, Dr. Buchbinder seeks the full measure of damages for Terrinoni's retaliatory termination and the Board's abdication of its duties including front and back pay, punitive damages, mental anguish, and reasonable attorneys' fees as set forth below under federal, state and local law.

## PARTIES AND JURISDICTION

1.     Dr. Buchbinder is a physician duly licensed to practice medicine in New York State.

2.     Dr. Buchbinder is a resident of New Jersey but has spent most of his career practicing in New York.

3.     Dr. Buchbinder graduated Yeshiva College *summa cum laude* in 1975, earning a Bachelor's in Economics, the Broff award for the highest ranked economic major, and The Norman Palefski Award for the highest ranking scholar athlete.

4.     Dr. Buchbinder then graduated from Albert Einstein College of Medicine in 1981 and was first licensed to practice medicine by the State of New York in 1985.

5.      Dr. Buchbinder completed residency training including being Chief Resident in Diagnostic Radiology and was awarded board certification in Diagnostic Radiology by the American Board of Diagnostic Radiology in 1986.

6.     Dr. Buchbinder is a nationally recognized physician and his achievements in patient safety and quality of care are well known.

7.     Dr. Buchbinder has earned a Life-Time Achievement Award from the American Board of Radiology, a Citation from the President of the Borough of Brooklyn, two clinical professorships

at Albert Einstein College of Medicine for Radiology and OB/GYN Women's Health, and a Best Teacher's Award from The Montefiore Medical Center.

8.      Dr. Buchbinder has recruited and mentored physicians who are now nationally recognized as leading practitioners in their respective fields.

9.      Dr. Buchbinder has decades of experience in oversight, review, and execution of internal reforms to improve hospital operations, patient care, training, and compliance.

10.     Defendant Gary Terrinoni is the President and CEO of The Brooklyn Hospital Center.

11.     Terrinoni has held this position since approximately November 2015.

12.     Upon information and belief, Terrinoni is a part-time resident of Kings County and enjoys a residence in Pennsylvania.

13.     TBHC is a domestic not for profit corporation that holds itself out as a 464-bed hospital located at 121 Dekalb Avenue, Brooklyn, New York.

14.     The TBHC holds itself out as an Equal Opportunity Employer with over 2,600 employees.

15.     TBHC is a "safety net" hospital that provides medical services to those residing in the proximate low-income communities.

16.     Approximately seventy-five (75%) percent of TBHC's revenue is derived from Medicare and Medicaid and twenty-five (25%) percent low-tier Health Maintenance Organizations servicing those residing in the relevant proximate communities.

17.     TBHC consistently receives the lowest possible 1-star rating for patient experience by the Center for Medicare and Medicaid Services ("CMS").

18.     Carlos P. Naudon was the Chair of TBHC's Board of Trustees (the "Board"), upon information and belief, until succeeded by Defendant Fontaine, which was publicly announced in May 2019; following his tenure as Chair, Naudon remained a Trustee of the Board with the title "Immediate Past Chair."

4

19.     Upon information and belief, Naudon is a resident of New York State.

20.     Anne Elizabeth Fontaine assumed the role of the Chair of TBHC's Board of Trustees immediately following Naudon; prior to that she was Vice-Chair of The Board.

21.     Upon information and belief, Fontaine is a resident of Kings County.

22.     The Board is ultimately responsible for overseeing management and execution of TBHC's operations to ensure all relevant compliance and to affect TBHC's mission of providing patient care.

23.     Maria Fiorini Ramirez is the Chair of the Board's Audit and Corporate Compliance subcommittee (the "Audit and Corporate Compliance Committee").

24.     Upon information and belief, Ramirez is a resident of New York State.

25.     Calvin J. Simmons is, upon information and belief, a resident of New York State, a member of the Board of Trustees of TBHC, and a member of the TBHC's Audit and Corporate Compliance Committee.

26.     Alireza Esmaelizadeh is, upon information and belief, a resident of New York State, a member of the Board of Trustees of TBHC, and a member of the TBHC's Audit and Corporate Compliance Committee.

27.     Gale Stevens-Haynes is, upon information and belief, a resident of New York State, a member of the Board of Trustees of TBHC, and a member of the TBHC's Audit and Corporate Compliance Committee.

28.     Joel Leitner is, upon information and belief, a resident of New York State, a member of the Board of Trustees of TBHC, and a member of the TBHC's Audit and Corporate Compliance Committee.

29.     The Audit and Corporate Compliance Committee is specifically charged with overseeing TBHC's compliance with all relevant laws, rules and regulations, reporting to the Board, and maintaining open channels of communication among the Board, TBHC, and senior management.

30.     Upon information and belief, the Board and its sub-committees, through actions or omissions of their Chairs and individual Trustees, abdicated their duties to TBHC and allowed Terrinoni to run amok at TBHC's expense and exposure.

31.     John Does No. 1 – 5 are unknown  members of TBHC's Board of Trustees who, upon information and belief, participated in or had knowledge of the hostile work environment created or fostered by Terrinoni, Dr. Buchbinder's retaliatory termination, as well as the waste and mismanagement as alleged herein.

32.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and, alternatively, diversity jurisdiction pursuant to 28 U.S.C. § 1332.

33.     Dr. Buchbinder secured a right-to-sue letter from the EEOC.  (Exhibit 1.)

## FACTUAL ALLEGATIONS

### Initial Employment of Dr. Buchbinder

34.     Upon information and belief, TBHC provides certain services through captively held professional corporations ("Captive PCs".)

35.     Upon information and belief, TBHC and its Captive PCs are governed commonly by the Board.

36.     Upon information and belief, TBHC and its Captive PCs are overseen and managed on a day-to-day basis by the CEO of TBHC.

37.     In July 2011, TBHC's former CEO agreed to employ Dr. Buchbinder as TBHC's Chair of Radiology effective November 1, 2011 at a base annual salary of $535,000 pursuant to a written employment agreement with an initial term of November 1, 2011 through December 31, 2014.

38.     Upon information and belief, Dr. Buchbinder was appointed as CEO of the Captive PC known as Brooklyn Hospital Radiology Services, P.C. (the "Radiology PC").

39.     TBHC provides radiological services through the Radiology PC.

6

40.     In conjunction with employing Dr. Buchbinder as the Chair of Radiology, TBHC caused a lawful and binding transfer of all shares of the Radiology PC to vest in Dr. Buchbinder.

41.     As Chairman, Dr. Buchbinder initially answered to the predecessor CMO and CEO.

42.     For work performed in the calendar years of 2012, 2013 and 2014, Dr. Buchbinder received discretionary bonuses of $90,000, $100,000 and $100,000, respectively, for his performance and contribution, which were approved by the former CMO, CEO, and the Board of Trustees.

43.     In May 2015, the CMO on behalf of TBHC agreed to retroactively raise Dr. Buchbinder's base annual salary to $701,000 as of January 1, 2015.  This action was based on his service and contribution to operations of TBHC and the health and welfare of its patients.

44.     In May 2015, the CMO caused TBHC to modify and amend Dr. Buchbinder's employment agreement renewing the term, effective January 1, 2015, for three consecutive three-year terms projecting employment through December 31, 2023.

45.     In September 2015, TBHC announced Terrinoni would assume the role of President and CEO at an approximate salary in excess of $1,000,000 per annum plus bonuses.

46.     Terrinoni was the Board's second-choice for the position and was only offered the post after the Board's first choice declined.

47.     On April 15, 2016, Terrinoni rewarded Dr. Buchbinder with a discretionary bonus of $40,000 for his individual efforts and contributions as a leader and manager for the prior calendar year with, upon information and belief, Board approval.

48.     On June 12, 2017, Terrinoni thanked Dr. Buchbinder for his service and contribution and rewarded him with a $50,000 discretionary bonus for the prior calendar year with, upon information and belief, Board approval.

49.     On June 8, 2018, Terrinoni praised Dr. Buchbinder for his tireless leadership efforts, thanked Dr. Buchbinder for his service and contributions and rewarded him with a $75,000

discretionary bonus for the prior calendar year with, upon information and belief, Board approval.

### Dr. Buchbinder's Promotion to CMO

50.     In November 2016, the CMO announced his resignation and Terrinoni asked Dr. Buchbinder to assume the CMO position while maintaining a dual role of Chair of Radiology at the same salary.

51.     At that time, Dr. Buchbinder began attending budget and senior staff meetings.

52.     On January 1, 2017, Dr. Buchbinder was made interim CMO, formally assumed the CMO role by the Board in March 2017 under Board appointment, and was made a Senior Vice President.

53.     TBHC provides community or walk-in clinic service through an entity known as Brooklyn Hospital Medical Group, P.C. d/b/a Brooklyn Health Alliance ("Medical PC").

54.     In conjunction with his appointment to CMO, TBHC caused a lawful and binding transfer of all shares of the Medical PC to vest in Dr. Buchbinder.

55.     Upon information and belief, TBHC conducts or intended to conduct specialized nuclear medicine services through an entity known as Brooklyn Hospital Nuclear Medicine, P.C. ("Nuclear PC").

56.     In conjunction with his appointment to CMO, TBHC caused a lawful and binding transfer of all shares of the Nuclear PC to vest in Dr. Buchbinder.

57.     Upon information and belief, TBHC conducts or intended to conduct certain medical services through an entity known as Brooklyn Hospital ECG Medicine Services, P.C. ("ECG PC").

58.     In conjunction with his appointment to CMO, TBHC caused a lawful and binding transfer of all shares of the ECG PC to vest in Dr. Buchbinder.

59.     Upon information and belief, TBHC conducts or intended to conduct certain medical services through an entity known as TBHC Anesthesiology Services, P.C. ("Anesthesiology PC").

60.     In conjunction with his appointment to CMO, TBHC caused a lawful and binding transfer of all shares of Anesthesiology PC to vest in Dr. Buchbinder.

61.     Upon termination, TBHC presented Dr. Buchbinder with separation papers, including a resignation and stock transfer agreement for the above Captive PCs, which Dr. Buchbinder did not sign.

### Dr. Buchbinder's Observations Regarding Terrinoni's Hostile Work Environment, Waste, and Mismanagement

62.     In January 2018, Dr. Buchbinder learned that despite forecasting a profit for CYE 2017, TBHC had to restate its financials to account for off-the-book expenses pursuant to a historic so-called "modified accrual accounting" system, which continued into Terrinoni's administration and concealed a significant multi-million dollar loss for CYE 2017 and prior years.

63.     Terrinoni, upon information and belief, concealed such losses by either revising financial statements from the prior years or reducing retained earnings.

64.     Around that same time, Terrinoni made it known to Senior Staff and Department Chairs he would fire anyone who spoke about him negatively to the Board or its members.

65.     To that end and shortly after assuming the role of interim CMO, Terrinoni told Dr. Buchbinder that he wanted the Chair of Pediatrics fired for "going to the Board" and being disloyal to Terrinoni after the latter had complained about Terrinoni's decision to reduce Pediatric services.

66.     As CMO, Dr. Buchbinder attended: Senior Staff Meetings attended by "C-suite" executives; Department Head meetings (attended by mid-level managers such as ward nurse managers, respiratory and occupational therapy managers, pharmacists, chairs of all departments,

all Senior Vice Presidents, the Executive Vice President, and the CEO); Monthly Chair Meetings (without the CEO); Monthly Board of Trustees Meetings with Senior Staff; Medical Board Meetings (Senior Staff, Department Chairs, and elected Medical Staff); Monthly Senior Staff Audit and Compliance Meetings (with the CEO); Town Hall and *ad hoc* Meetings (including support and nursing staff); Annual Meetings for Elections; Annual Internal Audit Meetings; Professional Staff Meetings; and regularly scheduled monthly one-on-one status meetings with the CEO.

67.     Throughout his tenure as CMO, Dr. Buchbinder witnessed Terrinoni's brash and hostile management style, which was, upon information and belief, exacerbated by the pressure of restating financial statements.

68.     Throughout his tenure as CMO, Dr. Buchbinder witnessed Terrinoni focus on, harass, abuse, and bully female staff in particular.

69.     Throughout his tenure as CMO, Dr. Buchbinder witnessed how Terrinoni would amplify his verbal abuse and bullying and did so in particular while addressing women or an audience composed primarily of women.

70.     At a Senior Staff meeting for example, Dr. Buchbinder and others witnessed how the male COO (a long-time friend hired by Terrinoni) told Terrinoni that his insistence that he (Terrinoni) personally approve all overtime, for all shifts around the clock, was impractical.  The COO did so without reprimand from Terrinoni.  However, Terrinoni verbally attacked, abused, and threatened to fire the female Chief Nursing Officer ("CNO") for stating the same objection.

71.     In another well-known Town Hall meeting with the Nursing Staff (a group that is almost exclusively female) and the CNO, Terrinoni unleashed his terror-based management style at the entire group, some of whom had just finished their shifts, and compelled a reluctant senior nurse to speak against her will.

72.     The senior nurse told Terrinoni that the biggest problem facing the nursing staff was the deliberate understaffing of nursing personnel on most nursing shifts.

73.     Terrinoni erupted "That's what I'm talking about!  Look at your attitude!  Then you don't need to be here.  Go find another job!" leaving the target of his abuse, and others, in tears.

74.     As CEO and despite his unwillingness to expend money to provide for adequate nursing staffing levels, Terrinoni engaged in wasteful spending and mismanagement that exposed TBHC to risk including third-party and patient claims.

75.     As CEO, Terrinoni had a fiduciary duty to avoid wasteful spending and to manage TBHC to avoid such risks.

76.     As CEO Terrinoni owed TBHC and the Board a duty to conduct himself and TBHC in full compliance with local, state, and federal laws, as well as TBHC's by-laws.

77.     Terrinoni wasted corporate assets by hiring or engaging outside associates and colleagues as contractors to conduct duplicative and unnecessary work.

78.     For example, Terrinoni engaged a "patient experience" consultant to purportedly review and consult on patient experience.

79.     Upon information and belief, the patient experience consultant's payments totaled hundreds of thousands of dollars and cost TBHC unnecessary overtime and disruption because the consultant met with large groups of staff during working hours.

80.     The patient experience consultant provided little or no benefit to TBHC's patient experience but received a lavish party during working hours to recognize her work at the conclusion of her engagement.  This wasteful celebration was at Terrinoni's direction and TBHC's expense.

81.     Upon information and belief, Terrinoni engaged other personal associates to review infrastructure and construction projects for little or no value added for hundreds of thousands of dollars.

82.    Upon information and belief, as CEO Terrinoni hired or engaged his loyal business associates to serve as a cadre of preferred insiders who did little more than duplicate work already performed by TBHC personnel and insulate Terrinoni from scrutiny or direct responsibility.

83.    For example, Terrinoni created a shadow financial department to make work for his personal associates and to insulate his management style as CEO thereby creating a financial department far too large for a hospital the size of TBHC.

84.    As CEO and while TBHC was operating at a critical deficit, Terrinoni recklessly spent hundreds of thousands of dollars to sponsor prestigious and inapposite advertising programs at Barclay's Center and the Brooklyn Academy of Music.

85.    The Barclay's Center and Brooklyn Academy of Music serve unaligned demographics unrelated to TBHC business model.

86.    Terrinoni invested in these venues to secure publicity and recognition for himself.

87.    As CEO and with alarming regularity, Terrinoni treated himself and his cadre of insiders and preferred employees to lavish dinners at TBHC's expense without a legitimate business purpose multiple times per month.

88.    As CMO, Dr. Buchbinder and others repeatedly advised cutting these unnecessary expenses in favor of other necessary expenditures, which requests Terrinoni rejected or ignored.

89.    As CMO, Dr. Buchbinder oversaw all professional departments and regularly communicated with Department Chairs regarding TBHC's operational and professional needs.

90.    Dr. Buchbinder received and repeatedly relayed complaints to Terrinoni that TBHC needed to replace aged equipment that frequently malfunctioned to avoid unnecessary risk to patients and lapses in critical patient services.

91.    On many occasions, Dr. Buchbinder reported to Terrinoni that TBHC's Cardiac

Catheterization apparatus and Interventional Radiology Angiographic apparatus were aged and

frequently failed.  Both were approximately ten-years old

92.    The Interventional Radiology Angiography machine was in poor working order because

of its age and its location in a room in which it was located above steam boilers resulting in poor-

quality images and frequent malfunction that repeatedly left the hospital without this life-saving

diagnostic tool.

93.    The Cardiac Cath machine is a life-saving piece of equipment that Terrinoni refused to

replace due to financial constraints while wasting corporate assets on self-indulgent marketing,

nepotism, and lavish dinners.

94.    Dr. Buchbinder reported to Terrinoni that TBHC's Obstetrics Department Labor and

Delivery area Ultrasound machine was approximately ten-years old and running on aged

software that frequently crashed, froze, or otherwise malfunctioned creating a risk to patients.

95.    The Obstetric Ultrasound machine in the Labor and Delivery Area is a critical piece of

technology that allows attending physicians to precisely assess fetal well-being and fetal-heart

abnormalities during the various stages of labor and delivery when time is of the essence.

96.    Terrinoni ignored the need to replace the obstetrics ultrasound equipment and only

authorized its replacement after a patient delivered a still-born baby following a malfunction in

the ultrasound machine.

97.    Upon information and belief, Terrinoni caused TBHC to borrow $50,000,000 from Mid-

Cap Finance Corporation based on, *inter alia*, inaccurate financial statements pursuant to the

"modified accrual accounting" system to remain solvent and sustain Terrinoni's spending and

waste.

98.    Dr. Buchbinder reported to Terrinoni and the Director of Internal Audit and Compliance

certain irregularities in the vascular ultrasound lab where technologists were tasked with the

responsibility of providing diagnostic impressions of these studies which were relied upon by treating clinical physicians (but were interpreted by vascular attending physicians only well after the fact) posing both great risk to patients and the potential for fraudulent or abusive billing practices.

99.     Terrinoni refused to take corrective action.

### Dr. Buchbinder Is Terminated For Opposing and Reporting Terrinoni's Hostile Work Environment, Waste, and Mismanagement

100.     In mid-2018, Dr. Buchbinder began discussing the hostile work environment Terrinoni was creating with the CNO and others.

101.     Around October 17, 2019, Dr. Buchbinder learned that the female CNO had disclosed the ongoing abuse, repeated termination threats, and hostile work environment that she had experienced, as well as that Terrinoni particularly bullied, harassed, and abused majority female audiences, to at least one Board Trustee.

102.     On the morning of October 22, 2018, Terrinoni erupted at the Town Hall Meeting with TBHC Nurses described in paragraph 70 of this Complaint.

103.     After the Town Hall Nurses' Meeting at a combined Senior Staff and Department Chair Meeting, and to insulate himself from any repercussions that could otherwise result from the abusive tantrum suffered by the nursing staff, Terrinoni admonished those present that he would fire anyone who "went to the Board".

104.     On October 23, 2018, Terrinoni singled-out and verbally attacked the CNO at a combined Senior Staff and all clinical chairs meeting for a trivial grievance.

105.     On October 24, 2018, Dr. Buchbinder met with the Director of Internal Audit and Compliance for the 2019 Annual Risk Assessment and Audit Planning Meeting.

106.     These meetings are held annually to prepare a pro-active plan to address current risks for the coming year and to review the success of the prior year's risk management plan.

107.     At that meeting, Dr. Buchbinder specifically disclosed the hostile work environment created by the CEO and his bullying of female staff, which exposed TBHC to risk of sexual harassment claims.  At that meeting Dr. Buchbinder specifically invited the Director of Internal Audit and Compliance to urge the Board to speak with him and protect him from Terrioni's retaliation.

108.     During this meeting, Dr. Buchbinder also disclosed the grave issues posed by the operation of the vascular ultrasound lab (and the concomitant billing issues) that are described herein, all of which posed great risk to patient well-being and potential fraud or abusive billing practices.

109.     Dr. Buchbinder additionally questioned whether he had a duty to report the risk to the Board and disclosed that other Senior Staff members had questioned their own obligations to inform the Board about Terrioni's behavior and attempts to intimidate staff members with retaliatory threats.

110.     Dr. Buchbinder likewise disclosed and questioned TBHC's financial instability due to Terrioni's profligate spending and the risks posed by critical aged and dilapidated equipment specifically including the Cardiac cath machine, the Interventional Radiology Angiograph and the Obstetrics Labor and Delivery area ultrasound as alleged herein.

111.     On October 25, 2018, the New York State Nurses Association (NYSNA as the local union for Nurses) posted the flyer attached hereto as Exhibit 2 around the hospital.

112.     On October 26, 2018, the Director of Internal Audit and Compliance forwarded the NYSNA flyer and a summary of her own personal concerns as well as those discussed at her meeting with Dr. Buchbinder by email specifically referencing exposure under Human Rights Laws created the foreseeable risk of sex discrimination, hostile work environment and harassment claims.  These emails were sent to Defendants Fontaine, as Chair or Vice-Chair of the Board, and Ramirez, as Chair of the Audit and Corporate Compliance Committees, and the

Executive Vice President (the "EVP"); other than the two Trustees, Terrinoni has terminated everyone associated with this email: its author, the EVP, and Dr. Buchbinder.

113. On October 27, 2018, the Director of Internal Audit and Compliance prepared detailed minutes of her 2019 Annual Risk Assessment Meeting with Dr. Buchbinder in the ordinary course of her position.

114. On October 29, 2018, Dr. Buchbinder met with an irate and agitated Terrinoni who verbally attacked Dr. Buchbinder for speaking badly about him, threatened Dr. Buchbinder with complete termination of his employment, or demotion back to Radiology by removing him from his position as Chief Medical Officer, and warned him to be very careful about what he said to Board members in the future.

115. On that same day, Dr. Buchbinder disclosed Terrinoni's threats to numerous other Senior Staff and the Director of Internal Audit and Compliance was made aware of these threats as well.

116. On that same day, Terrinoni fired the CNO because she complained to the Board about the hostile work environment that he was creating or fostering.

117. Terrinoni used the CNO as a scapegoat for the Town Hall Meeting and poor patient experience scores as pre-text for her termination.

118. On November 1, 2018, the Director of Internal Audit and Compliance reported Terrinoni's retaliatory threat to Dr. Buchbinder to the Chair of the Audit and Corporate Compliance Committee.

119. The Director of Internal Audit and Compliance was thereafter reprimanded and received a *de facto* demotion by being instructed that she now had to report to the Chief Compliance Officer and could no longer report directly to the Board.

120. During this conversation, the Director of Internal Audit and Compliance again specifically disclosed Terrinoni's threat to terminate Dr. Buchbinder to the Chief Compliance Officer.

121.    Upon information and belief, on November 15, 2018, Senior Staff learned that the Board had purportedly engaged outside counsel to investigate the concerns held by the Director of Internal Audit and Compliance and Dr. Buchbinder regarding Terrinoni's behavior.

122.    Around that same time, the Director of Human Resources told Dr. Buchbinder that the Board had engaged counsel to investigate Terrinoni in light of the Director of Internal Audit and Compliance's concerns, and explained that Dr. Buchbinder would be questioned.

123.    During this conversation with the Director of HR, Dr. Buchbinder specifically disclosed Terrinoni's retaliatory threat to terminate him.

124.    Upon information and belief, Terrinoni falsely denied knowledge and involvement in the external counsel investigation.

125.    Upon information and belief, Terrinoni hand-picked additional individuals to be interviewed by outside counsel to serve Terrinoni's self-interest.

126.    Upon information and belief, Terrinoni had access to the witness statements and verbally reprimanded certain witnesses for what they told outside counsel during interviews.

127.    Upon information and belief, the Board abdicated its individual and collective duties to investigate Terrinoni's behavior, management, and spending.

128.    By failing or refusing to place Terrinoni on leave during the investigation, the Board allowed Terrinoni to insinuate himself into (or attempt to control) the conduct and outcome of outside counsel's investigation. He did so to insulate himself from responsibility for his own wrongdoing and to minimize the potential adverse consequences that could otherwise result from his abusive tirade at the Town Hall Meeting with TBHC Nurses.

129.    Dr. Buchbinder met with outside counsel and, *inter alia*, reported that he observed Terrinoni bully, abuse, and harass female staff.

130.    During this meeting, Dr. Buchbinder also disclosed his concerns about Terrinoni's waste and mismanagement and its impact on his ability to replace aged and unreliable diagnostic equipment that is essential to assuring patient well-being.

131.    On November 23, 2018, *The New York Daily News* reported that Terrinoni had berated nurses in a nasty screed leaving some in tears on October 22, 2018 prompting the Union to demand an apology. A copy of that article is attached hereto as Exhibit 3.

132.    Thereafter around New Year's, the Senior Staff was informed that outside counsel had found no illegal wrongdoing on the part of Terrinoni but reportedly recommended he receive a mentor to develop better communication skills.

133.    Following Terrinoni's purported exoneration, the Internal Director of Internal Audit and Compliance was fired on January 31, 2019 purportedly due to a reorganization of audit and compliance.

134.    Following Terrinoni's purported exoneration, Terrinoni began cancelling, delaying, or missing one-on-one meetings with Dr. Buchbinder, which had been previously scheduled to address critical patient safety and operational issues, as well as regularly scheduled senior staff Audit and Compliance Meetings

135.    Upon information and belief, Terrinoni did so because he had already decided to fire Dr. Buchbinder on October 29, 2018 but delayed execution of his plan while he was personally under investigation and to build a pre-textual record.

136.    On March 18, 2018, Dr. Buchbinder was terminated, escorted off the premises, searched, and informed when he returned to pick up personal belongings that he was required to have a security escort at all times while on TBHC premises.

137.    Dr. Buchbinder's termination was pre-text and falsely attributed to financial reorganization.

138.    On the day of his termination at an evening public professional staff gathering, Terrinoni praised Dr. Buchbinder for his service and skills and explained that Dr. Buchbinder was let go solely for internal financial reasons.

139.    Any alleged financial basis to terminate Dr. Buchbinder was pre-textual insofar TBHC and Terrinoni were forecasting a $95,000,000 sale of TBHC property as well as a multi-million dollar payment from HealthFirst for arrearages due on services previously rendered and partially paid as well as distributions for TBHC's minority interest in HealthFirst, which interest alone was estimated to be worth tens of millions of dollars.

140.    Prior to March 18, 2019, no Senior Staff had ever been fired for financial reasons.

141.    There was no bona fide or good faith basis to escort Dr. Buchbinder off the premises following a purported termination for financial reorganization.

142.    When Terrinoni had the prior Chair of Pediatrics terminated, the latter was allowed to work through his entire notice period and not escorted off the premises.

143.    TBHC continued to pay Dr. Buchbinder for 180-days to fulfill its contractual notice obligation but barred him from working resulting in the waste of the cost of his salary during the notice period.

144.    Upon information and belief, had TBHC been under true financial pressure to terminate its CMO contract for financial reasons, it would have availed itself of Dr. Buchbinder's labor during the notice period after publicly praising Dr. Buchbinder's performance.

145.    The Annual Board retreat with Senior Staff is held in March, in which the CMO provides an annual report, and takes several weeks of advance planning that historically included Dr. Buchbinder.

146.    The 2019 Annual Board retreat was held on March 19, 2019 and Terrinoni excluded Dr. Buchbinder from advance planning because Terrinoni had decided to fire Dr. Buchbinder on October 29, 2018 as alleged.

147. Terrinoni terminated Dr. Buchbinder and vindictively had him escorted off the premises in an effort to embarrass him, make an example of him, and to deter other employees from going to the Board to complain about him.

148. At all relevant times, Dr. Buchbinder was and remains qualified for employment in the dual capacity of CMO and Chair of Radiology.

149. But for Terrinoni's unlawful termination and the Board's abdication of its duties, Dr. Buchbinder would have remained employed in that dual capacity throughout the term of his current employment contract as amended January 1, 2015.

150. But for Terrinoni's unlawful termination and the Board's abdication of its duties, Dr. Buchbinder would have remained employed in that dual capacity at TBHC through the anticipated date of his retirement around June 30, 2026.

151. Due to Terrinoni's unlawful termination and the Board's abdication of its duties, Dr. Buchbinder will no longer be able to retire on June 30, 2026.

## AS FOR COUNT 1 - AGAINST TBHC
## RETALIATION 42 USC § 2000e

152. Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by reference.

153. Dr. Buchbinder perceived that Terrinoni's treatment of women created a hostile work environment.

154. Dr. Buchbinder disclosed Terrinoni's hostile work environment to the Director of Internal Audit and Compliance during the 2019 Annual Risk Assignment and Audit Planning meeting.

155. Dr. Buchbinder disclosed Terrinoni's hostile work environment to outside counsel for the Board of Trustees.

156. Dr. Buchbinder was engaged in protected activity.

157.    The Director of Internal Audit and Compliance reported Dr. Buchbinder's complaints to the attention of the Board and Audit and Corporate Compliance Committee.

158.    Terrinoni knew about Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

159.    Terrinoni told Dr. Buchbinder that he would either demote or terminate Dr. Buchbinder for speaking badly about him as a result of Terrinoni's discovery or knowledge of Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

160.    Terrinoni terminated Dr. Buchbinder or caused his termination.

161.    Plaintiff's termination is causally related to his protected activity.

162.    The termination is an adverse employment activity that is reasonably likely to deter other employees from engaging in protected activity.

163.    Plaintiff is entitled to back-pay, front-pay, lost benefits and other remuneration, punitive damages, prejudgment interest at 9% and reasonable attorneys' fees, costs and disbursements.

### AS FOR COUNT 2 –AGAINST TBHC AND TERRINONI RETALIATION NEW YORK EXEC. L. § 296

164.    Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by reference.

165.    Dr. Buchbinder perceived that Terrinoni's treatment of women created a hostile work environment.

166.    Dr. Buchbinder disclosed the hostile work environment created by Terrinoni to the Director of Internal Audit and Compliance during the 2019 Annual Risk Assessment and Audit Planning meeting.

167.    Dr. Buchbinder disclosed Terrinoni's hostile work environment to outside counsel for the Board of Trustees.

168.    Dr. Buchbinder was engaged in protected activity.

169.    The Director of Internal Audit and Compliance reported Dr. Buchbinder's complaints to

the attention of the Board and Audit and Corporate Compliance Committee.

170.    Terrinoni knew about Dr. Buchbinder's report to the Director of Internal Audit and

Compliance.

171.    Terrinoni told Dr. Buchbinder that he would either demote or terminate Dr. Buchbinder for

speaking badly about him as a result of Terrinoni's discovery or knowledge of Dr. Buchbinder's

report to the Director of Internal Audit and Compliance.

172.    Terrinoni terminated Dr. Buchbinder or caused his termination.

173.    Plaintiff's termination is causally related to his protected activity.

174.    The termination is an adverse employment activity that is reasonably likely to deter other

employees from engaging in protected activity.

175.    Plaintiff is entitled to back-pay, front-pay, lost benefits and other remuneration, punitive

damages, prejudgment interest at 9%, an award for mental anguish, and reasonable attorneys' fees,

costs and disbursements.

## AS FOR COUNT 3 –AGAINST TBHC AND TERRINONI
## RETALIATION UNDER NYC ADC § 8-107

176.    Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by

reference.

177.    Dr. Buchbinder perceived that Terrinoni's treatment of women created a hostile work

environment.

178.    Dr. Buchbinder disclosed the hostile work environment created by Terrinoni to the Director

of Internal Audit and Compliance during the 2019 Annual Risk Assessment and Audit Planning

meeting.

179.    Dr. Buchbinder disclosed Terrinoni's hostile work environment to outside counsel for the

Board of Trustees.

22

180.    Dr. Buchbinder was engaged in protected activity.

181.    The Director of Internal Audit and Compliance reported Dr. Buchbinder's complaints to the attention of the Board and Audit and Corporate Compliance Committee.

182.    Terrinoni knew about Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

183.    Terrinoni told Dr. Buchbinder that he would either demote or terminate Dr. Buchbinder for speaking badly about him as a result of Terrinoni's discovery or knowledge of Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

184.    Terrinoni terminated Dr. Buchbinder or caused his termination.

185.    Plaintiff's termination is causally related to his protected activity.

186.    The termination is an adverse employment activity that is reasonably likely to deter other employees from engaging in protected activity.

187.    Plaintiff is entitled to back-pay, front-pay, lost benefits and other remuneration, punitive damages, prejudgment interest at 9%, an award for mental anguish, and reasonable attorneys' fees, costs and disbursements.

### AS FOR COUNT 4 –AGAINST TBHC
### NEW YORK LABOR L. § 741 HEALTHCARE WHISTLEBLOWER

188.    Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by reference.

189.    At the 2019 Annual Risk Assessment and Audit Planning meeting, Dr. Buchbinder disclosed, or threatened to disclose to the Board, TBHC's improper quality of patient care.

190.    At the 2019 Annual Risk Assessment and Audit Planning meeting and at Senior Staff meetings, Dr. Buchbinder objected to, or otherwise refused to participate in, endorse, or support TBHC's improper quality of patient care.

191.    TBHC's improper quality of patient care posed great risk to patients by operating aged, unreliable, faulty dilapidated equipment such as Interventional Radiology Angiographic Machine, Cardiac Cath Machine, and Obstetric Labor and Delivery area Ultrasound Machine.

192.    TBHC's improper quality of patient care were institutionally sanctioned by Terrinoni and, by its nonfeasance, misfeasance or malfeasance, the Board and included allowing technologists to provide diagnostic impressions of vascular ultrasound studies that were relied upon by treating clinical physicians but interpreted by vascular attending physicians well after the fact, thus posing both great risk to patients.

193.    TBHC's improper quality of patient care and substandard patient care practices, as described herein, created a substantial and specific danger to public health or safety in violation of applicable law, rule, regulation or declaratory rule adopted pursuant to law.

194.    Dr. Buchbinder, at all relevant times, acted in good-faith to protect TBHC, its patients, and the public.

195.    Terrinoni knew about Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

196.    Terrinoni told Dr. Buchbinder that he would either demote or terminate Dr. Buchbinder for speaking badly about him as a result of Terrinoni's discovery or knowledge of Dr. Buchbinder's report to the Director of Internal Audit and Compliance.

197.    Terrinoni terminated or caused Dr. Buchbinder's termination.

198.    Plaintiff's termination is causally related to his report to the Director of Internal Audit and Compliance.

199.    Plaintiff is entitled to an injunction to avoid violations of any law, rule, regulation or declaratory rule adopted pursuant to law; reinstatement as Chief Medical Officer and Director of Radiology, and CEO of the Radiology PC, with full fringe benefits and seniority rights, an award

for back-pay for lost wages, benefits and other remuneration, and an award for costs,

disbursements and reasonable attorneys' fees.

### AS FOR COUNT 5 – AGAINST TERRINONI, NAUDON, FONTAINE, RAMIREZ, SIMMONS, ESMAELIZADEH, STEVEN-HAYNES, LEITNER AND DOES NO. 1 - 5 BREACH OF FIDUCIARY DUTY

200.    Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by

reference.

201.    The individual Trustees of the Board and its sub-committees, specifically including

Defendants Naudon, Fontaine, Ramirez, Simons, Esmaelizadeh, Steven-Hayes, Leitner, and John

Does No. 1-5 in this Count, are fiduciaries of TBHC and its Captive PCs, specifically including in

this Count the Radiology, Medical, Nuclear, ECG, Anesthesiology PCs and their shareholders.

202.    At all relevant times herein, and at least through the date of his termination, Dr. Buchbinder

was the sole shareholder of each of the above Captive PCs.

203.    Terrinoni as the CEO is a fiduciary to TBHC, its Captive PCs, and their shareholders.

204.    Upon information and belief, pursuant to New York State Department of Health regulation,

the individual Trustees of the Board and its subcommittees are responsible for overseeing the CEO.

205.    Upon information and belief, pursuant to New York State Department of Health

Regulations, the individual Trustees of the Board and its subcommittees are responsible for

overseeing and effectuating compliance with laws, rules, regulations and TBHC by-laws.

206.    Upon information and belief, the Board created the Audit and Corporate Compliance

Committee to fulfill its regulatory duty to ensure compliance with all federal, state and local laws

as well as to create and execute internal and outside auditing programs and compliance.

207.    Upon information and belief, the Audit and Corporate Compliance Committee and its

individual Trustees are responsible, *inter alia*, for: (i) ensuring and maintaining open

communication between internal compliance, senior management, and the Board; (ii) enterprise

risk management including the development and execution of appropriate corrective strategies to

avoid hospital exposure to third-party claims and potentially compensable events; (iii) integrity of financial statements; and (iv) compliance with all legal and regulatory requirements.

208.    At all times, the Board and its individual Trustees maintain ultimate legal responsibility for all matters delegated to the CEO or its subcommittees.

209.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee abdicated or abandoned their duties to oversee the CEO and protect TBHC.

210.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee knew, or would have known through the ordinary exercise of their oversight position, about the hostile work environment Terrinoni created, or those under his charge reasonably perceived him as creating, against female staff.

211.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee knew, or would have known through the ordinary exercise of their oversight position, about Terrinoni's wasteful and mismanagement of TBHC resources at the expense of TBHC, its equipment, and patients.

212.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee knew, or would have known through the ordinary exercise of their oversight position, about the so-called "modified accrual accounting" system created in accurate or infirm financial statements upon which third-parties and regulators knowingly relied.

213.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee knew, or would have known through the ordinary exercise of their oversight position, willfully and grossly ignored their duties to oversee Terrinoni by allowing him to terminate Dr. Buchbinder on palpably pre-textual financial reasons without inquiry after reporting the very concerns that prompted the Board's investigation of Terrinoni.

214.    The individual Trustees of the Board and the Audit and Corporate Compliance Committee breached and willfully and grossly ignored, their duties by failing to investigate, by failing to

correct, or by allowing Terrinoni: (i) to terminate Dr. Buchbinder for reporting risk in good-faith during an annual Risk Assessment and Audit Planning meeting with the Director of Internal Audit and Compliance despite the high regard in which the Board had held Dr. Buchbinder throughout his tenure; (ii) terminate Dr. Buchbinder for exercising his lawful duties in good-faith including reporting or threatening to report Terrinoni's hostile work environment, waste, and mismanagement to the Board; (iii) to cover-up his unlawful decision to terminate Dr. Buchbinder by attempting to control, supervise, mislead or direct the outside counsel investigation to create a false paper trail of compliance; (iv) waste TBHC assets on inefficient consults, contracts, dinners, and marketing events; (v) to refuse to replace necessary and critical equipment at the expense of patient safety; and (vi) to hide corporate losses and redistribute them through infirm financial statements.

215.    The foregoing exposed and continues to expose TBHC and the Captive PCs to patient safety and other potentially compensable events.

216.    The foregoing exposed and continues to expose TBHC and the Captive PCs to wrongful death and failure to diagnose claims.

217.    The foregoing exposed and continues to expose TBHC and the Captive PCs to inadequate and illegal oversight at the hands of Terrinoni and an absentee Board.

218.    Terrinoni's continued employment and management and the Board's ongoing abdication of their individual and collective duties renders demand on the Board for corrective action futile.

219.    Wherefore Plaintiff, on behalf of the Captive PCs, is entitled to Judgment enjoining violations of any law, rule, or regulation protecting patient safety, an accounting, disgorgement of all wasted and diverted corporate assets, pre-judgment interest at 9%, costs, disbursements, and reasonable attorneys' fees, and, individually, Plaintiff is entitled to a Declaration that his termination was unlawful and an award for compensable damages as alleged in Counts 1 - 4.

## AS FOR COUNT 6 –AGAINST TBHC
### DECLARATORY JUDGMENT

220.    Plaintiff repeats and incorporates the allegations set forth in paragraphs 1 - 151 by

reference.

221.    TBHC's written employment agreement with Dr. Buchbinder states in paragraph 13:

> Upon expiration or termination of this Agreement for any reason, and for two (2)
> years thereafter, you shall not directly or indirectly, in any manner, induce or
> attempt to induce any patient, employee, agent, representative, associate, physician
> or other person associated with the Hospital or Faculty Practice or Captive
> Professional Corporations to terminate his/her association with the Hospital or
> Faculty Practice or Captive Professional Corporation in any manner, directly or
> indirectly, interfere with the relationship between the Hospital or Faculty Practice
> or Captive Professional Corporation and such person without the CEO's prior
> written consent.

222.    Paragraph 13 is overbroad and does not seek to protect TBHC's legitimate interests as an

employer by purporting to convert Buchbinder's pre-existing relationships.

223.    Paragraph 13 is overbroad and does not seek to protect TBHC's legitimate interests as an

employer by purporting to convert relationships created at public expense.

224.    Paragraph 13 is overbroad and void for public policy reasons.

225.    This dispute between the parties, through their actions and words, is ripe for judicial

intervention and declaratory relief pursuant to CPLR § 3001.

**WHEREFORE,** Plaintiff demands an award and absolute Judgment against Defendants

as follows:

1.    On Counts 1 - 3 in amounts proven at trial including compensatory damages for lost

benefits and other remuneration, mental anguish, compensatory damages including lost earnings in

the approximate amount of $5,325,000, and punitive damages as determined by the jury up to and

including the constitutionally permissible award in the approximate amount of $22,000,000,

together with pre-judgment interest, reasonable attorney's fees, costs and disbursements.

2.      On Count 4: an injunction to avoid violations of any law, rule, regulation or declaratory rule adopted pursuant to law; reinstatement as Chief Medical Officer and Director of Radiology, and CEO of the Radiology PC, with full fringe benefits and seniority rights, an award for back-pay for lost wages, benefits and other remuneration, prejudgment interest at 9%, and an award for costs, disbursements and reasonable attorneys' fees;

3.      On Count 5: on behalf of the Captive PCs an injunction to avoid violations of any law, rule, or regulation protecting patient safety, an accounting, and disgorgement of all wasted and diverted corporate assets, pre-judgment interest, costs, disbursements, and reasonable attorneys' fees, and, individually Plaintiff, is entitled to a Declaration that his termination was unlawful and an award for compensable damages as previously alleged in counts 1 – 4 as applicable;

4.      On Count 6: a declaration that the non-solicitation clause in Dr. Buchbinder's employment contract is void on its face and in violation of the public policy of this State and he is free to refer patients or other professionals to competing institutions throughout New York State; and

5.      Such other relief as this Court deems just and proper.


Date:   Uniondale, New York
        March 17, 2020
                                        RUSKIN MOSCOU FALTISCHEK P.C.
                                        *Attorneys for Plaintiff*

                                        By: _____
                                             Matthew Bryant
                                             1425 RXR Plaza
                                             East Tower, 15th Floor
                                             Uniondale, New York 11556
                                             (516) 663-6600


871998v8

29